**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

| | |
|---|---|
| CHRISTOPHER GEORGE , JESSICA CHANDRA,  : | |
| LISA JAME, CHELSEA MALEY, APRIL                 : | |
| BODDIE, MICKAEL LOUIS, EDUARDO LEACH,  : | Case No.: 19-cv-06185(AJN)(SN) |
| JOSH FOLAN, LOGAN VAIRO, BASMA             : | |
| ATTIEH, and ROBERT CAROBENE on behalf of  : | **AMENDED CLASS ACTION** |
| themselves and a class of similarly situated         : | **COMPLAINT** |
| individuals,                                                        : | |
|                                                                        : | |
|                                     Plaintiffs,                  : | **Jury Trial Demanded** |
|                                                                        : | |
|                      v.                                              : | |
|                                                                        : | |
| STARBUCKS CORPORATION d/b/a               : | |
| STARBUCKS COFFEE COMPANY,              : | |
|                                                                        : | |
|                                     Defendant.                : | |

----------------------------------------------------------------X

Plaintiffs Christopher George, Jessica Chandra, Lisa Jame, Chelsea Maley, April Boddie,

Mickael Louis, Eduardo Leach, Josh Folan, Logan Vairo, Basma Attieh, and Robert Carobene,

individually, and on behalf of a proposed Class (the "Class" or "Plaintiffs"), by and through their

undersigned counsel, as and for their Amended Complaint against Defendant Starbucks

Corporation d/b/a Starbucks Coffee Company ("Starbucks" or "Defendant"), hereby allege as

follows:

## PRELIMINARY STATEMENT

1.      Starbucks has built itself into one of the most recognizable brands in the world by

selling an image of a company that cares about its products and its customers — and it asks its

customers to pay a hefty premium for its products as a result.  The reality is a far different story.

Starbucks stores throughout Manhattan have for many years been permeated with a toxic

pesticide called Dichlorvos (2,2-dichlorovinyl dimethyl phosphate or "DDVP"), which is highly

poisonous and completely unfit for use in proximity to food, beverages and people.  Starbucks

knows about the poisonous qualities of DDVP and knows that it has been used in Starbucks' stores throughout Manhattan, but has neither taken appropriate action to stop its use nor informed customers about the dangerous conditions to which they have been unwittingly exposed.  In doing so, Starbucks has knowingly put its customers' well-being at risk.

2.      DDVP is an active ingredient emitted into the air through products called "No-Pest Strips," which are only intended to be used in unoccupied structures to rid such structures of vermin, bugs and insects.  However, they are explicitly *not* to be used anywhere human beings are present, and especially in situations where the pesticide could come into contact with food and/or drinks.  The label on these products clearly warns:

> **"Do not use in the food/feed areas of food/feed processing or food/feed manufacturing or food/feed service establishments,"** and **"Do not use in kitchens, restaurants or areas where food is prepared or served."**

3.      The Center for Disease ("CDC") control has cautioned that:

> **"Dichlorvos can chemically react with an important enzyme in your brain and nerves called acetylcholinesterase and stop them from working properly. When this happens, signals sent between your nerve cells and to your muscles are disrupted."**

4.      The CDC has further warned that symptoms from DDVP exposure include:

> **"loss of bladder control," "muscle tremors," "labored breathing," "nausea," "anxiety," "diarrhea," "muscle weakness," "convulsions" and paralysis"** and that more severe exposure can even **"result in coma, inability to breathe and death."**

5.      On *numerous occasions* over the last several years, Starbucks' employees and third-party exterminators have informed regional and district management – both verbally and in writing – about the improper and dangerous use of No-Pest Strips throughout stores in Manhattan.  Nonetheless, despite these complaints, Starbucks has continued to allow No-Pest

Strips to be used in its Manhattan stores – left to contaminate the food and beverages that

Starbucks sells to consumers as the most premium products available.  Needless to say,

Starbucks has closely held this information and has not disclosed to the public that DDVP has

poisoned the environment in its stores.

## JURISDICTION AND VENUE

6.      Plaintiffs commenced this action on May 21, 2019 by filing a summons and

complaint, titled *George v. Starbucks Corp.*, Index No. 653015/2019 (the "State Complaint").

Subsequently, Defendant removed this case to this Court pursuant to 28 U.S.C. §1441(a) on July

2, 2019.

7.      The Court has jurisdiction over this matter under diversity of citizenship, which is

codified pursuant to 28 U.S.C. § 1332, given that Plaintiffs are citizens of the States of New

York, South Carolina and California, and Defendant is a corporation incorporated and with a

principal place of business in the State of Washington, and this action involves an amount in

controversy in excess of $75,000, exclusive of interest and costs.  The Court also has jurisdiction

pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class has

more than 100 members, contains at least one member of diverse citizenship from Defendants,

and the amount in controversy exceeds $5 million.

8.      The Court has personal jurisdiction over Starbucks because it conducts business

in New York and a substantial portion of the events and omissions giving rise to this action took

place in New York, NY.  By way of example only, Starbucks has over 100 retail stores in

Manhattan.  Plaintiffs all purchased Starbucks products at Starbucks stores in Manhattan

throughout the relevant time period, and, upon information and belief, were exposed to the toxic

chemical described below.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendant operates and conducts business in this district on a regular and daily basis.

## PARTIES

10.     Plaintiff Christopher George is an adult resident of New York, NY.

11.     Plaintiff Jessica Chandra is an adult resident of New York, NY.

12.     Plaintiff Lisa Jame is an adult resident of New York, NY.

13.     Plaintiff Chelsea Maley is an adult resident of Lindenhurst, NY.

14.     Plaintiff April Boddie is an adult resident of New York, NY.

15.     Plaintiff Mickael Louis is an adult resident of Brooklyn, NY.

16.     Plaintiff Eduardo Leach is an adult resident of Brooklyn, NY.

17.     Plaintiff Josh Folan is an adult resident of Playa Del Rey, CA.

18.     Plaintiff Logan Vairo is an adult resident of Bluffton, SC.

19.     Plaintiff Basma Attieh is an adult resident of Queens, NY.

20.     Plaintiff Robert Carobene is an adult resident of Queens, NY.

21.     Starbucks is a foreign business corporation organized and existing under the laws of the State of Washington with a principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134.  Starbucks owns and operates a global chain of coffee shops comprising over 13,000 stores in more than 70 countries.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND

22.     Coffee is one of the most popular drinks in the word, and particularly in the United States, where more than 60 percent of the population drinks at least one cup daily.[1]  This makes the United States the biggest coffee consuming nation in the world, drinking approximately 400 million cups of coffee per day.[2]  The United States is home to more than 35,000 retail coffee shops.[3]

23.     In 1971, Starbucks was founded as a fledgling operation based on the inspiration of three partners who saw an opportunity to provide high quality coffee to an otherwise stale market for gourmet coffee.[4]  However, it was not until 1987—when Howard Schulz purchased what was then a six store operation—that Starbucks started its famous ascent to the top of this ultra-competitive market.  In his first year at the helm, Mr. Schulz generated $1.3 million in revenue.[5]

24.     Within only a few years, Mr. Schulz had transformed Starbucks and would soon thereafter forever change the way Americans drink coffee.  By 1989, Starbucks had grown to 46 domestic store locations across the Northwest and Midwest.  By 1992, when Starbucks held its initial public offering ("IPO"), it had 140 U.S. locations and more than $73.5 million in revenue.

---

[1]     https://www.washingtonpost.com/news/wonk/wp/2015/06/17/19-maps-and-charts-that-explain-pretty-much-everything-about-coffee/?utm_term=.b955f7397784  (last visited May 14, 2019)

[2]     http://www.e-importz.com/coffee-statistics.php (last visited May 14, 2019)

[3]     https://www.beveragedaily.com/Article/2018/11/06/US-coffee-shop-market-grows-to-45.4bn-valuation-in-2018  (last visited May 14, 2019)

[4]     https://www.starbucks.com/about-us/company-information (last visited May 14, 2019)

[5]     http://ceroncatalina.com/starbucks/history/ (last visited May 14, 2019)

The IPO raised $25 million by selling 12 percent of the Company, putting its total valuation at approximately $271 million.[6]

25.     Of course, that was only the beginning of Starbucks' road to coffee domination. As of 2018, Starbucks had approximately 13,000 stores worldwide, served approximately 3.1 billion customers, generated $24.7 billion in revenue and employed more than 275,000 employees.[7]

## II.     STARBUCKS' CLAIMS ABOUT THE "STARBUCKS EXPERIENCE"

26.     Starbucks is widely used as a case study for its ability to market itself in a highly competitive industry.  Starbucks has implemented a relentless and widespread campaign to convince the public that it provides premium products in a superior environment relative to other retail coffee, beverage and food sellers.

27.      In fact, Starbucks has coined a term to describe the premium environment it sells its customers—the "Starbucks Experience."  As the Company has explained in its annual SEC filings:

> [T]he Starbucks Experience is built upon superior customer service and a seamless digital experience **as well as clean and well-maintained stores that reflect the personalities of the communities in which they operate, thereby building a high degree of customer loyalty**.[8]

28.     Without any ambiguity, Starbucks holds out to its own shareholders in publicly available documents that the *cleanliness* and *well-maintenance* of its stores builds customer loyalty and is an integral part of what it offers to its customers.

---

[6]     Id.

[7]     https://www.sec.gov/Archives/edgar/data/829224/000082922418000052/sbux-9302018x10xk.htm (last visited May 14, 2019)

[8]     Id. (emphasis added)

29.     The cleanliness of its stores is so critical because Starbucks actively urges customers to not merely buy products there, but to congregate in its stores.  Starbucks markets its stores as a "Third Place" —a place on par with their homes and offices where its customers gather and build a sense of community.[9]  Starbucks states:

> We are committed to creating a culture of warmth and belonging where everyone is welcome. This policy is intended to help maintain the third place environment in alignment with our mission "to inspire and nurture the human spirit – one person, one cup and one neighborhood at a time."[10]

30.     Of course, Starbucks also attempts to convince the public that it sells premium products made from premium ingredients.  According to Starbucks, its care in selecting only the best ingredients ensures that its food and beverages not only taste good, but substantively improve its customers' well-being.

31.     For instance, but only by way of example, as the Company has explained in one advertisement, its coffee contains the "**Best Coffee for the Best You**" and the "**Taste of Inspiration.**"



---

[9]     https://www.starbucks.com/about-us/company-information (last visited May 1, 2019)
[10]    https://stories.starbucks.com/press/2018/use-of-the-third-place-policy/ (last visited May 1, 2019)

32.   Plaintiff Attieh viewed this advertisement in New York.

33.   Starbucks emphasizes that the quality of its products and ingredients sets it apart from its competitors.  Starbucks tells its customers that any product other than its own is nothing short of a "compromise:"



34.   Plaintiff Attieh viewed this advertisement in New York.

35.   Starbucks also promises to oversee the entire production process, from farming to distribution, to ensure that the Company's products contain *only* those premium ingredients:

> Starbucks is committed to selling the finest whole bean coffees and coffee beverages. To ensure compliance with our rigorous coffee standards, we control coffee purchasing, roasting and packaging and the global distribution of coffee used in our operations.[11]

---

[11]   https://s22.q4cdn.com/869488222/files/doc_financials/annual/2017/01/FY17-Starbucks-Form-10-K.pdf (last visited May 14, 2019)

36.    Starbucks maintains that this process has led to "an excellent reputation globally for the quality of our products, for delivery of a consistently positive consumer experience and for our global social impact programs."[12]

37.    As one popular Starbucks marketing campaign extolls, "**It's Not Just Coffee**. **It's Starbucks**" and attempts to portray Starbucks coffee as uniquely premium:



38.    Plaintiff Attieh viewed both of these advertisements in New York and Plaintiff Folan viewed the advertisement claiming that Starbucks coffee "is handcrafted all the way from the farm to you" in New York.

39.    From the quality of the ingredients to the process in which its products are made, Starbucks promises its customers the "**PERFECT**" coffee and a coffee-drinking experience that a customer "won't find [] in any other cup of coffee:"

---

[12]    Id.



40.     Plaintiff Boddie viewed the advertisement referencing the "heart, soul . . . love" that Starbucks includes in its coffee products while in New York.

41.     Upon information and belief, Starbucks' marketing campaign includes several other advertisements not included herein that are in the exclusive possession of Starbucks.

42.     Upon further information and belief, these advertisements ran across the country, including in New York.

43.     As a result of Starbucks' pervasive advertising campaign, Starbucks intentionally fostered the belief that its customers only received the best—premium products made with premium ingredients that can be enjoyed in a premium environment.

III.   **STARBUCKS CHARGES PREMIUM PRICES FOR "PREMIUM" PRODUCTS**

44.     Starbucks openly admits that it charges a significantly higher price for its products than its competitors do in exchange for the so-called premium products and environment Starbucks, and Starbucks alone, provides.

45.     According to the Company's own estimates, Starbucks charges 38% more for its coffee than do its competitors.[13]  The higher prices Starbucks charges only reinforces the image it seeks to cultivate as a premium brand with premium products.

46.     Far from hiding the fact that customers pay more to purchase its products, this premium pricing is a central component of its marketing campaigns.  Starbucks trumpets these higher prices to differentiate it from cheaper (and supposedly lower quality) competition.

47.     In fact, Starbucks cautions customers against choosing a cheaper alternative as such options would require them to pay some sort of ominous hidden price:

---

[13]     https://markets.businessinsider.com/news/stocks/starbucks-stock-price-expensive-coffee-in-morning-losing-to-cheaper-competition-afternoons-2018-6-1027320203 (last visited May 10, 2019)



48.     In another, similar, advertisement, Starbucks implores its customers to "**consider . . . what you're getting for your money**."  As Starbucks claims, "the little extra you pay for our coffee," allows it to buy the highest quality ingredients and create "the right atmosphere to dream, work and chat in," because its customers "**are buying a cup of coffee from a company that cares**" about them:

12



49.     Starbucks' message is clear—in exchange for paying a higher, premium price, customers receive a clean, comfortable environment to enjoy food and beverages that are made with only the best premium ingredients.  Central in that message is that Starbucks will safeguard the health and well-being of its customers.

50.     As the Company has explained:

> **[D]oing good is so much a part of who we are as people, a company and a brand that our mission and values are ingrained in our business strategy.**[14]

51.     Plaintiffs, who have all been loyal and frequent Starbucks customers, were aware of the brand that Starbucks established—a caring company with a commitment to the highest level of quality control in all facets of its business, from the products it sells to the stores in which it sells them.

52.     Plaintiffs relied on the brand that Starbucks has sought to establish through its marketing campaign in New York in paying a premium price for Starbucks' products over those of its competitors.

## IV.     STARBUCKS EXPOSES ITS CUSTOMERS TO TOXIC CHEMICALS

### A.     The Filthy Condition Starbucks Allows in its Manhattan Stores[15]

53.     Starbucks has built a multi-billion dollar brand on its commitment to being a company that uses only the highest quality ingredients in its products and to provide a clean, comfortable environment where its customers can enjoy their purchases.

54.     However, with respect to the Starbucks locations in Manhattan, Starbucks has knowingly failed to live up to its promises.

55.     Instead, as alleged in the Fox Complaint, Starbucks stores throughout Manhattan have been allowed to fall into a state of disrepair resulting from the failure of the Company's

---

[14]     https://s22.q4cdn.com/869488222/files/doc_financials/annual/2018/2019-Proxy-Statement.pdf (last visited April 18, 2019)

[15]     All of the allegations concerning the unsanitary conditions at Starbucks' Manhattan stores contained herein are based on the information contained in Fox, et. al. v. Starbucks Corp., 19-cv-04650 (the "Fox Complaint").

employees to maintain proper sanitary conditions, such as, *inter alia*, promptly addressing food spills, draining standing water and cleaning fecal droppings from rodents.

56.     Glaringly, as alleged, the unsanitary conditions are often concealed in areas of the stores not immediately visible or accessible to customers, such as under sinks, behind cabinets and in the food preparation area.  Nevertheless, their proximity to the food and beverages poses a substantial health hazard that Starbucks has chosen to ignore.

57.     In some cases, the prevalence of disgusting conditions in certain stores caused the formation of dangerous mold and growths inimical to the safety of human beings, and garbage is allowed to remain uncleaned for long enough to become faded and discolored:[16]

 

---

[16]     The following photographs were taken by Paul D'Auria, a former Pest Control Technician who serviced Starbucks' stores in Manhattan, as described below.

 

58.     These unsanitary conditions create a separate health issue—they form a breeding ground for flies, cockroaches, fruit flies, silverfish and other insects and pests.

59.     By way of example only, the following depicts the presence of maggots and the eggs from fruit flies behind the coffee bar and under a sink in Manhattan locations:

 

60.     This is hardly a secret internally at Starbucks.  Starbucks' corporate management has reportedly been aware of the filthy environments in its Manhattan stores and has steadfastly refused to address the issue.   This failure to take action flies directly in the face of its claim of

being "**committed to being a deeply responsible company in the communities where we do business**."[17]

61.    Rather than addressing the underlying circumstances that are the root cause of these infestations, Starbucks has recklessly permitted and allowed its employees to use a toxic pesticide in its stores to attempt to rid the locations of these problems.

**B.    No-Pest Strips With DDVP**

62.    In order to address the plague of insects that have resulted from the disgusting conditions in its Manhattan stores, many of the Company's employees use a product designed by Spectrum Brands Holdings.

63.    Specifically, many Starbucks employees in Manhattan have used insecticides contained in the product sold under the name "Hot Shot No-Pest 2" strips ("No-Pest Strips"), which are commercially available in many home and garden stores and online:

---

[17]    https://s22.q4cdn.com/869488222/files/doc_financials/annual/2018/2018-Annual-Report.pdf (last visited April 17, 2019)




64.     As described on its retail labeling:

Hot Shot No-Pest Strip utilizes controlled release technology to
slowly diffuse **a deep-penetrating vapor in enclosed spaces for
up to 4 months**. The clean, odorless vapor is evenly distributed
throughout the enclosed treatment area, killing visible and hidden
insects on contact and preventing new insect infestations while
you're away.

65.     The active ingredient in these No-Pest Strips is the time-released vapor known as

DDVP, which kills insects.

66.     Each No-Pest Strip is designed to disperse DDVP vapors throughout a 1,200

cubic foot room for a period of up to four months.

67.     DDVP is a synthetic organic chemical that has been used as an industrial pesticide

for decades.  However, DDVP is also poisonous to humans, as borne out by several studies

conducted by governmental agencies.

18

68.     As explained by the CDC, "Dichlorvos can chemically react with an important enzyme in your brain and nerves called acetylcholinesterase and stop them from working properly. When this happens, signals sent between your nerve cells and to your muscles are disrupted."[18]

69.     Among the symptoms associated with DDVP exposure are: **loss of bladder control, muscle tremors, labored breathing, nausea, anxiety, diarrhea, muscle weakness, convulsions and paralysis**.[19]

70.     More severe exposure "**can result in coma, inability to breathe and death**."[20]

71.     The toxic effects of DDVP on humans is significantly exacerbated when the chemical is ingested orally, such as when consumed through food or water.  DDVP symptoms through oral exposure are much more pronounced and appear at a significantly higher rate.[21]

72.     As a result, DDVP, and No-Pest Strips in particular, do not belong anywhere that food preparation or consumption activities occur.

73.     In addition to its other symptoms, the Environmental Protection Agency ("EPA") has identified DDVP as a "probable carcinogen" in humans.[22]

74.     The U.S. Department of Health and Human Services has also found that DDVP may reasonably be anticipated to be a substance that causes cancer.[23]

75.     The CDC recommends that DDVP only be used in an enclosed space when any humans present are given a respirator or other breathing apparatus.[24]

---

[18]     https://www.atsdr.cdc.gov/toxprofiles/tp88.pdf (last visited April 28, 2019).
[19]     Id.
[20]     Id.
[21]     Id.
[22]     https://www.epa.gov/sites/production/files/2014-05/documents/table1.pdf (last visited April 28, 2019).
[23]     https://www.atsdr.cdc.gov/toxprofiles/tp88.pdf  (last visited April 28, 2019).

76.     As the CDC has explained, even short term exposure to DDVP could have

potentially lethal consequences to humans:

> **"[DDVP] may cause effects on the central nervous system. Cholinesterase inhibitor. Exposure above the OEL (Occupational Exposure Limit) <u>may result in death</u>."**

(Emphasis added).

77.     The packaging of the No-Pest Strips itself confirms this fact, warning to

customers that it: "May be fatal if swallowed . . . not to be taken internally by humans."

**C.     <u>Starbucks' Pervasive Misuse of No-Pest Strips Throughout Manhattan</u>**

78.     Given the lethal danger it poses to humans, the warnings contained on every box

of No-Pest Strips makes clear that it is not to be used anywhere humans may be present.

79.     In fact, No-Pest Strips can only be used in unoccupied structures, "provided that

they are unoccupied for more than four months immediately following placement of a pest strip,"

which is the full amount of time that they emit DDVP.

80.     This four-month period coincides with the amount of time that the No-Pest Strips

emit DDVP.

81.     Put another way, according to the manufacturer's own explicit warnings, it is

unacceptably dangerous for human beings to occupy a space contaminated with DDVP,

irrespective of the quantity of DDVP to which they were exposed.

82.     Additionally, because the effects of DDVP are particularly severe when ingested

orally, the labeling clearly warns:

> **"Do not use in the food/feed areas of food/feed processing or food/feed manufacturing or food/feed service establishments,"** and **"Do not use in kitchens, restaurants or areas where food is prepared or served."**

---

[24]     http://www.aresok.org/npg/nioshdbs/npg/npgd0202.htm (last visited April 28, 2019).

83.     More importantly, Starbucks itself is well aware of the dangers associated with DDVP.  The internal documentation provided by Starbucks to its "producers, processors and suppliers" recognizes that DDVP has been classified as a "Highly Hazardous" Pesticide by the World Health Organization.

84.     Accordingly, Starbucks purports to have a "zero tolerance" policy for the use of DDVP during its supply chain process, including for use by the farmers and producers from which it sources its beans.[25]

85.     Incredibly, however, Starbucks does not follow such strict standards when it comes to the use of this toxic chemical in its stores, where it directly comes into contact with the Company's customers and contaminates the food and/or drinks that they consume.[26]

86.     Instead, as has been alleged in the Fox Complaint, throughout the last three years, Starbucks has systematically allowed its employees to use No-Pest Strips throughout its Manhattan stores, ostensibly to treat the insect infestations that resulted from the unsanitary conditions that are present.

87.     Just as reckless, the Fox Complaint makes clear that Starbucks has made no effort to control where they were placed in the stores.  By way of example only, though Starbucks claims that its bakery products contain "no artificial dyes or flavors," DDVP strips are among the items Starbucks permits next to its food, where the DDVP contaminates the baked goods:

---

[25]     See "C.A.F.E. Practices Verifier and Inspector Operations Manual v5.3," Starbucks Coffee Company, Oct. 2017, at p. 68 (emphasis added).
[26]     All of the allegations concerning the misuse of No Pest Strips in Starbucks' Manhattan stores contained herein the Fox Complaint.



 

88.     These No-Pest Strips, which are designed to emit enough DDVP to cover a 1,200 cubic foot room, are instead sealed in an approximately 3'x2' enclosed space, coating the bakery items therein with a dangerous amount of poison.

22

89.     Similarly, No-Pest Strips are placed next to the actual food preparation

equipment, where they contaminate any food made at Starbucks:



90.     No-Pest Strips have also been placed under store counters (next to active mouse

traps):



91.     No-Pest Strips have also been placed adjacent to air vents, where the toxic chemicals would be more widely dispersed throughout the store, increasing the exposure of its customers and products to DDVP:






92.     In addition, although the warning label on the No-Pest Strips specifically states that multiple strips must be kept "at least 10 ft. apart," Starbucks has allowed its employees to pile as many as half a dozen on top of each other:



93.     In placing so many No-Pest Strips in such close proximity, Starbucks multiplies

the amount of DDVP emitted into the atmosphere, and thus, the risk of toxic exposure to its

customers, to increase exponentially.

94.     The following are a handful of examples of the blatant misuse of No-Pest Strips

throughout Starbucks stores in Manhattan:
















95.    Irrespective of where the specific No-Pest Strips were located, in all these photographs they were each within feet of customers, including, upon information and belief, Plaintiffs.

96.    These customers were completely oblivious to the fact that every second they remained in Starbucks brought with it additional exposure to a dangerous poison in the air they breathed and in the products they consumed.

## V.    STARBUCKS' CORPORATE MANAGEMENT IS AWARE OF THE FLAGRANT MISUSE OF NO-PEST STRIPS IN ITS MANHATTAN LOCATIONS AND REFUSES TO TAKE REMEDIAL ACTION[27]

97.    Paul D'Auria worked as a licensed, certified Pest Control Technician in New York City for more than 21 years until his retirement in June 2018.

98.    For approximately 15 of those years, Mr. D'Auria worked for AVP Termite & Pest Control of New York, Inc. ("AVP"), an extermination services provider based in New York City.

99.    Through AVP, Mr. D'Auria was the Pest Control Technician primarily responsible for servicing Starbucks.

100.    Since 2013, it has been Mr. D'Auria's responsibility to provide routine, regularly scheduled pest control and extermination services at almost all of the Starbucks stores located in Manhattan.  The Company's stores were his exclusive, full-time account.

101.    Mr. D'Auria was also responsible for answering any emergency calls that might come in as a result of a sudden, unexpected infestation at a particular store in Manhattan.

102.    As a result of his position, Mr. D'Auria visited nearly every Starbucks store in Manhattan on multiple occasions between 2013 and his retirement in June 2018.

---

[27]    Again, the allegations herein are based on public allegations in the Fox complaint.

103.    In his capacity as Pest Control Technician for Starbucks, Mr. D'Auria personally observed the repeated use of No-Pest Strips throughout Starbucks' Manhattan stores over the last three years.

104.    During his visits to these stores, Mr. D'Auria would photograph examples of the No-Pest Strips at various Starbucks locations and include them as evidence supporting his written complaints concerning their improper usage.

105.    As has been publicly reported, Mr. D'Auria personally observed that "Starbucks management personnel routinely placed numerous sets of DDVP No-Pest Strips within virtually each of the more than 100 stores that he serviced."[28]

106.    As an expert in the field, and after having contracted lymphoma from exposure to airborne toxins following the September 11, 2001 World Trade Center attack, Mr. D'Auria is particularly wary of the effects of dangerous toxins in the environment.

107.    Accordingly, Mr. D'Auria immediately recognized the harm that indiscriminately exposing customers to DDVP would cause them and repeatedly escalated his concerns to his supervisor, Jill Shwiner, who was the Director of Operations for AVP from 1990 through late 2018.

108.    Ms. Shwiner also personally observed the use of No-Pest Strips while on-site at various Starbucks locations and communicated her objections in person on those occasions.

109.    Together, Mr. D'Auria and Ms. Shwiner repeatedly complained to members of Starbucks management about the improper and flagrantly dangerous use of DDVP at locations throughout Manhattan.

---

[28]    See Fox Complaint at ¶46.

110.    Ms. Shwiner and/or Mr. D'Auria delivered such written warnings to Starbucks Regional and/or District Managers, *inter alia*, on or around:  May 29, 2016; July 18, 2016; August 1, 2016; August 10, 2016; October 25, 2016; March 1, 2017; June 28, 2017; July 5, 2017; September 11, 2017; September 26, 2017; October 15, 2017; October 17, 2017; January 16, 2018; March 17, 2018; and April 18, 2018.

111.    Just by way of example, the warnings made by Ms. Shwiner and Mr. D'Auria included the following complaints about the use of No-Pest strips in Manhattan Starbucks stores:

- "[N]o pest strips were **bought by Starbucks and placed on top of cabinets** and should be removed."

- "**My tech or myself are down under cabinets working and work over and find we've been working next to the strips breathing in the chemical not to mention the fact that they aren't allowed in food establishments**."

- "Recently there has been an increasing amount of stores we find them in. **The product label clearly states it's a violation to use this product in food establishment**."

- Warning that DDVP strips have been repeatedly "**found in FOH under counters hanging from pipes or on floor, on top of high cabinets near vents, one was recently found inside a pastry[]case.**"

- "**These are against the law to have in food establishments. The active pesticide in strip, Dichlorvos, is toxic.**"

- "**[U]nder the pastry case at motor was a brand new pet strip with DDVP which should never be used in food establishments**. The motor fan was probably circulating vapors throughout the store**.**"

- Referencing, among other things: "**the improper use of this product and the liability that it creates**" as a result of the hazard to employees and others subject to exposure in Starbucks stores.

- Emphasizing, among other things, that additional No-Pest Strips were discovered on consecutive days in multiple stores and urging Starbucks' Regional Quality

Assurance Manager to reiterate to Store Managers that "**these are illegal to use[,] let alone toxic.**"

- "This is a serious hazard for those touching it and as well as those in the area. The use of these strips has increased. This is [a] serious environmental issue. **Dichlorvos is an organophosphate which affects the cholinesterase levels in the brain and it interferes with proper working of the nervous system in insects as well as humans.**"

- "**A pest strip was hidden under the bagels.**"

- "DDVP strip was found in the pastry case."

(Emphasis added).

112.    Even recently, Starbucks was also independently informed about its improper use of pesticides in its Manhattan stores by the Department of Health, which has cited it for "Pesticide use not in accordance with label or applicable laws":



113.    Despite being repeatedly made aware of the dangerous and toxic risk to which it was subjecting its customers, Starbucks ignored the complaints and continued to allow its managers to use the No-Pest Strips in its stores.

114.    In fact, Starbucks' Regional Quality Assurance Manager admitted to Ms. Shwiner in October 2017 that Starbucks personnel had failed to internalize "the importance of breaking this habit" and instead continued to misuse DDVP in Manhattan-area stores with impunity.

115.    Upon information and belief, Starbucks continues to use these No-Pest Strips in its stores in Manhattan to this day, having made the decision that it is more cost effective to pay for the strips than clean up the underlying root cause of the infestations—the unsanitary conditions that pervade its Manhattan stores.

116.    In doing so, Starbucks has intentionally and wantonly exposed its customers to toxic chemicals with a complete disregard for the impact on their customers' health.

### **NAMED PLAINTIFFS' ALLEGATIONS**

117.    Plaintiffs are all loyal Starbucks customers who visited the Company's Manhattan locations and purchased Starbucks food and beverages over the last three years, making them all victims of Starbucks' false and misleading statements and fraudulent concealment of material information related to its products.

118.    As a result, rather than purchasing premium products in a superior environment, Plaintiffs have purchased inferior, poisoned products in an environment where the air is permeated by a chemical the CDC has expressly stated is extremely harmful and dangerous to humans.

119.    Upon information and belief, Plaintiffs were all present and paid a premium for purchases at Starbucks stores in Manhattan at a time in which they were using No-Pest Strips. As a result, Plaintiffs were all exposed to dangerous and toxic amounts of DDVP.

120.    Mr. George has visited Starbucks locations in Manhattan several times a month over the last three years, varying his orders between a Grande Black Coffee, Tall Hot Chocolate, a croissant or a side of fruit.  Mr. George purchased products at Starbucks because he was under the impression from Starbucks' numerous marketing and advertisement statements that he was purchasing premium products in a premium environment.

121.     Ms. Chandra has visited Starbucks locations throughout Manhattan approximately once per week over the last three years where she has often enjoyed the Blonde Roast, the Pumpkin Spice Latte and/or a breakfast sandwich.  Ms. Chandra purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she was purchasing premium products in a premium environment.

122.     Ms. Jame has visited Starbucks locations throughout Manhattan several times per week over the last three years, favoring a Grande Iced Triple Espresso or a Trenta Green Iced Tea.  Ms. Jame purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she was purchasing premium products in a premium environment.

123.     Ms. Maley has visited Starbucks stores throughout Manhattan on a near daily basis over the last three years, where she customarily orders a Venti Caramel Macchiato or a Grande Almond Milk Matcha Latte.  Ms. Maley purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she was purchasing premium products in a premium environment.

124.     Ms. Boddie has visited Starbucks locations throughout Manhattan several times a month over the last three years, and orders different products depending on her mood.  Among her favorite drinks are the Starbucks Cold Brew, the Caramel Latte and the Pumpkin Spice Latte. Ms. Boddie purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she he was purchasing premium products in a premium environment.

125.     Mr. Louis has visited Starbucks stores throughout Manhattan at least twice a week over the last three years where he most often orders a Grande Hazelnut Coffee.  Mr. Louis

purchased products at Starbucks because he was under the impression from Starbucks' numerous marketing and advertisement statements that he was purchasing premium products in a premium environment.

126.    Mr. Leach has visited Starbucks locations throughout Manhattan several times a week over the last three years and most commonly orders a Grande Green Tea and a cheese Danish.  Mr. Leach purchased products at Starbucks because he was under the impression from Starbucks' numerous marketing and advertisement statements that he was purchasing premium products in a premium environment.

127.    Up until May 2018, while he lived in New York, Mr. Folan visited Starbucks locations throughout Manhattan several times a week, usually ordering a Venti Sugar-free Vanilla Latte.  Mr. Folan purchased products at Starbucks because he was under the impression from Starbucks' numerous marketing and advertisement statements that he was purchasing premium products in a premium environment.

128.    Ms. Vairo lived in New York until July 2016, during which time she visited Starbucks locations in Manhattan on a daily basis.  Her preferred order was a Venti Vanilla Latte or a Venti Blonde Roast with extra soy.  Ms. Vairo purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she was purchasing premium products in a premium environment.

129.    Ms. Attieh has visited Starbucks locations throughout Manhattan several times a month for the last three years where she orders either an Iced Java Chip or an Iced Caramel Frappuccino.  Ms. Attieh purchased products at Starbucks because she was under the impression from Starbucks' numerous marketing and advertisement statements that she was purchasing premium products in a premium environment.

130.    Mr. Carobene has visited Starbucks locations in Manhattan several times over the last three years, varying his orders between a Grande Black Coffee, a croissant or a cookie.  Mr. Carobene purchased products at Starbucks because he was under the impression from Starbucks' numerous marketing and advertisement statements that he was purchasing premium products in a premium environment.

131.    Given the pervasiveness of Starbucks' advertising campaigns, Plaintiffs were all aware of Starbucks' statements claiming to offer its customers premium products containing only the highest quality ingredients.

132.    Similarly, Plaintiffs were aware of the statements and advertisements from the Company equating the Starbucks experience with a safe and clean environment in which its customers could spend time enjoying these so-called premium products.

133.    As a result of these statements and advertisements, Plaintiffs expected that they were purchasing premium products in a safe, clean environment; but Starbucks concealed that that was not what they were actually selling.  Plaintiffs did not get what they bargained for.

134.    To the contrary, the food and beverages Plaintiffs purchased would not have had any value to them and would not have been purchased at all had Starbucks informed them that such products contained a poisonous chemical.

135.    Beyond merely spending money on the products from Starbucks, Plaintiffs also paid a premium cost, over and above what they would have spent on similar food and beverages, to enjoy Starbucks products.

136.    Plaintiffs also would not have entered Starbucks' stores in Manhattan to purchase any products if they were made aware of the fact that being in these stores alone exposed them to a toxic, potentially lethal, poison.

137.    Collectively, Plaintiffs purchased products at numerous Manhattan stores, including, but not limited to, the Starbucks stores located at:

- 13-25 Astor Pl, New York, NY 10003;

- 25 Union Square West, New York, NY 10003;

- 10 Waverly Pl, New York, NY 10003;

- 222 Broadway, New York, NY 10007;

- 393 3rd Ave, New York, NY 10016;

- 296-300 3rd Ave, New York, NY 10010;

- 4 W 21st St, New York, NY 10010;

- 80 Delancey St, New York, NY 10002;

-  482 West Broadway, New York, NY 10012;

- 14 Wall Street, New York, NY 10005;

- 250 W 57th St, New York, NY 10107;

- 301 W 145th St, New York, NY 10039;

- 325 W 49th St, New York, NY 10019;

- 871 8th Ave, New York, NY 10019;

- 1449 2nd Ave, New York, NY 10021;

- 1488 3rd Ave #A, New York, NY 10028;

- 1261 Lexington Ave, New York, NY 10028;

- 1142 Madison Ave, New York, NY 10028;

- 125 Chambers St, New York, NY 10007;

- 180 W Broadway, New York, NY 10013;

- 684 6th Ave, New York, NY 10010;

- 1095 Lexington Ave, New York, NY 10075;

- 245 E 80th St, New York, NY 10075;

- 1128 3rd Ave, New York, NY 10065;

- 822 Lexington Ave, New York, NY 10065;

- 1542 3rd Ave, New York, NY 10028;

- 731 Lexington Ave, New York, NY 10022;

- 135 E 57th St, New York, NY 10022;

- 875 6th Ave, New York, NY 10001;

- 510 6th Ave, New York, NY 10001;

- 49 ½ 1st Ave, New York, NY 10003;

- 1500 Broadway, New York, NY 10036;

- 1077 3rd  Ave, New York, NY 10065;

- 1585 Broadway, New York, NY 10036; and

- 5 E 40th St, New York, NY 10017

138.    Upon information and belief, all of these stores used No-Pest Strips in the last three years, thereby exposing Plaintiffs, and other customers, to toxic and harmful levels of DDVP.

139.    What Plaintiffs did not, and could not know, however, is that Starbucks' statements about its so-called premium products were knowingly false and misleading.  Contrary to what Starbucks' advertising claimed, the Company allowed its employees to use a poisonous pesticide in its stores knowing DDVP was toxic, and potentially lethal, to its customers.

140.    As a result of Starbucks' misleading conduct, upon information and belief, Plaintiffs were exposed to a dangerous amount of a poison in the air they breathed throughout their time in the Company's stores in Manhattan.

141.    Additionally, because the DDVP was dispersed through the air, and kept in close proximity to the products Starbucks sold, Plaintiffs ingested material and dangerous amounts of the toxin in the food they ate and the beverages they drank.

142.    Plaintiffs experienced significant emotional distress as a result of their unwitting exposure to a chemical that is considered a potentially lethal carcinogen, including, but not limited to, anxiety that they would develop serious health issues and fear for their physical well-being as a result of consuming Starbucks' products.

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs seek redress in their individual capacities and on behalf of a Class consisting of similarly situated consumers.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) or (b)(3), Plaintiffs seek Class certification of a Class defined as follows:

> **All individuals who purchased a product from a Starbucks location in Manhattan that was using No-Pest Strips in the last three years.**

144.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or subclass divisions after discovery.

145.    Excluded from the Class are: (i) any judge presiding over this action and their family members; (ii) Starbucks, its subsidiaries, successors, or any entity in which Starbucks has a controlling interest, Starbucks' current or former employees, officers, or directors; (iii) persons that properly exclude themselves from the Class; and (iv) the legal representatives, successors, or assignees of any properly excluded persons.

146. __Numerosity__.  The potential Class members as defined are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown because such information is in the exclusive control of Starbucks, upon information and belief, the Class is greater than 100,000 individuals.

147. __Commonality__.  There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual Class members.  These common questions of law and fact include, *inter alia*, whether:

- Starbucks violated New York's General Business Law § 349;

- Starbucks violated New York's General Business Law § 350;

- Starbucks engaged in, and continues to engage in, unlawful, deceptive and unfair practices that are substantially likely to mislead the public, and therefore members of the Class;

- Starbucks engaged in, and continues to engage in, unlawful, deceptive and unfair practices in representing to the public, and therefore the Class, that it provides clean, comfortable stores that are a safe environment for its customers;

- Starbucks engaged in, and continues to engage in, unlawful, deceptive and unfair practices in representing to the public, and therefore the Class, that it controls the quality of the products it sells to ensure that they only contain the highest quality ingredients that are safe for public consumption;

- Plaintiffs and the Class members paid a premium for Starbucks' products;

- Starbucks' knowing and willful exposure of Plaintiffs, and Class members, to a toxic, dangerous chemical, caused them to suffer emotional harm;

- Starbucks' deceptive conduct resulted in profits and pecuniary gain received from consumers, including Class members;

- Class members are entitled to damages under New York's General Business Law § 349 and § 350;

- Declaratory and injunctive relief is available in this action;

- Plaintiffs and Class members are entitled to injunctive relief, attorneys' fees and costs; and

- Class members are entitled to equitable or any other forms of relief.

148. **Typicality**. Plaintiffs are members of the Proposed Class they seek to represent and Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class members were exposed and subjected to Starbucks' uniform practices and policies surrounding its misrepresentations to the public that it provides clean, hygienic stores, and safe, healthy products that has resulted in, and will continue to cause, irreparable harm but for immediate action by the Court, including, but not limited to, Plaintiffs and Class members paying a premium for Starbucks' products, and Plaintiffs and Class members suffering emotional distress from having been unwittingly exposed to a poison.

149. **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' counsel are competent and experienced in litigating class actions.

150. **Superiority of Class Action**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all of the Class members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of

the asserted claims.  There will be no difficulty in the management of this action as a class action.

151.    **Injunctive and Declaratory Relief**.  Starbucks' practices are uniform as to all Class members.  Starbucks has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Violations of the General Business Law § 349)**
***On Behalf of Plaintiffs and the Class***

152.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

153.    As alleged herein, Defendants have been engaged in consumer-oriented conduct towards Plaintiffs and the Class that has been false, misleading and deceptive in a material way.

154.    As alleged herein, Plaintiffs and the Class suffered, and continue to suffer, damages as a result of the alleged deceptive conduct.

155.    Defendants' conduct constitutes a willful violation of GBL §349.

### SECOND CAUSE OF ACTION
**(Violations of the General Business Law § 350)**
***On Behalf of Plaintiffs and the Class***

156.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

157.    As alleged herein, Defendants have engaged in false advertising as defined under GBL § 350.

158.    As alleged herein, Plaintiffs and the Class suffered, and continue to suffer, damages as a result of the alleged false advertising.

159.    Defendants' conduct constitutes a willful violation of GBL §350.

## JURY DEMAND AND PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Putative Class pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    An injunction that Defendant cease allowing the use of No-Pest Strips in its stores;

D.    Declare this action to be maintainable as a class action pursuant to FRCP 23., and direct Defendant to provide Plaintiffs with a list of all members of the Class, including all last known addresses, telephone numbers and e-mail addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.    Designate Plaintiffs as representatives of the Class, and their counsel of record as class counsel;

F.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and members of the Class for all monetary and/or economic damages;

G.    An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiffs and members of the Class in an amount to be determined at trial, plus

prejudgment interest;

      H.     Award punitive and exemplary damages as requested herein, in an amount

sufficient to punish Defendant and deter others from similar wrongdoing;

      I.     Enter judgment for costs and attorneys' fees, including litigation expenses

reasonably incurred in the prosecution of the action; and

      J.     Such other and further equitable relief as the Court may deem just and proper.

Dated: August 23, 2019
      New York, New York          Respectfully submitted,

                                    **WIGDOR LLP**

                                    By: _____

                                      Douglas H. Wigdor
                                      David E. Gottlieb
                                      Renan F. Varghese

                                    85 Fifth Avenue
                                    New York, NY 10003
                                    Telephone: (212) 257-6800
                                    Facsimile: (212) 257-6845
                                    dwigdor@wigdorlaw.com
                                    dgottlieb@wigdorlaw.com
                                    rvarghese@wigdorlaw.com

                                    *Counsel for Plaintiffs and the Proposed*
                                    *Class*